

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

NO. 2-09-012-CV

IN THE INTEREST OF M.F., A CHILD

------------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

## I. INTRODUCTION

Appellant James appeals the trial court's order terminating his parental rights to his child, Martha.[2]  In three issues, James challenges the legal and factual sufficiency of the evidence to support the trial court's family code section 161.001(1) termination ground findings and the trial court's finding that

---

[1] *...* *See* Tex. R. App. P. 47.4.

[2] *...* Pursuant to Texas Rule of Appellate Procedure 9.8(b)(2), we are using aliases for the names of the child and the parent involved in this case.

termination of James's parental rights to Martha is in her best interest.[3]  We

will affirm.

## II.  BACKGROUND

At the time of trial, Martha was approximately three years old.  James,

who is the alleged biological father of Martha, admitted at trial that he is her

father.  James is currently serving a five-year sentence for burglary.  James has

been arrested multiple times for burglary and the unauthorized use of a motor

vehicle.  His current stint in jail is not his first.

While he was serving state jail time for the unauthorized use of a motor

vehicle, Martha's mother began to write letters to James.[4]  When he was

released, they began a romantic relationship that lasted for several years.

Martha is a child of that relationship.

At trial, both James and Martha's mother admitted that they were

frequent drug users both before and after Martha's birth.  James testified that

he smoked marijuana and did not work while Martha's mother was pregnant

with her.  According to James, he and Martha's mother frequently smoked

---

[3]... *See* Tex. Fam. Code Ann. § 161.001(1) (Vernon Supp. 2009).

[4]... Although the State has convicted James for the unauthorized use of a motor vehicle on at least two previous occasions, the record is not clear if he was serving time during his first or second conviction when Martha's mother began writing to him.

methamphetamine and marijuana. Even though he had experienced multiple run-ins with the law and had been incarcerated multiple times, James never sought any type of drug treatment prior to his conviction for burglary. And although James denies ever using drugs around Martha, the record indicates that both he and Martha's mother used drugs while caring for both Martha and Martha's older half-brother. By James's own testimony, he used drugs while caring for Martha's older half-brother. When asked about this fact, James's response was, "This was not my child." The record also indicates that James knowingly left Martha with her mother at times he was aware that she would engage in drug use.

Martha's mother testified that James had anger issues, and although James's anger would subside when he was high on drugs, his anger would worsen after he would "[come] down off of it." She said that his post-drug-use anger could sometimes last for days. According to Martha's mother, James and she were involved in frequent bouts of domestic violence in front of both children while the couple lived with Martha's maternal grandfather. One such bout persuaded the grandfather to bring officers to the house and have James "escorted out." The grandfather eventually asked James to leave for good after the couple had a heated argument and the grandfather heard from neighbors that James was selling drugs in the neighborhood. Afterwards, the couple

broke up. James has had little contact with Martha since she turned six months old.

James testified that he wished to maintain parental rights because he would like to be a part of her life. James admitted that he could not hope to care for Martha until some time after his release, when Martha would be approaching seven years old. Although he testified that he was currently not using drugs and had taken parenting classes, the Child Protective Services' (CPS) caseworker testified that there was no evidence that James had completed any part of his service plan.

CPS removed Martha from her mother's care after allegations were made that the mother was using and selling drugs. Martha's mother has voluntarily relinquished her rights to Martha, believing that it is in Martha's best interest to live where she currently lives—with Martha's maternal grandfather who provides and cares for Martha and wishes to adopt her. CPS's caseworker testified that the grandfather provides a stable and possibly permanent home for both Martha and her older half-brother and that it was in their best interests—emotionally, financially, and psychologically—to stay with the grandfather and allow him to pursue adopting them. There was also testimony that the grandfather was concerned that once James was released, he intended to move himself and Martha to Kansas.

4

Martha's grandfather testified that he would provide stability and security for Martha. He also said that if he was allowed to adopt her, it would allow Martha to live in the same home with her half-brother, whom according to the grandfather, she gets "along extremely well" with.

The trial court terminated James's parental rights, finding by clear and convincing evidence that he knowingly placed or knowingly allowed Martha to remain in conditions or surroundings that endangered her physical or emotional well-being; that he engaged in conduct or knowingly placed Martha with persons who engaged in conduct that endangered her physical or emotional well-being; and that termination of James's parental rights to Martha was in her best interest. *See* Tex. Fam. Code Ann. §§ 161.001(1)(D), (E), 161.001(2) (Vernon Supp. 2009). This appeal followed.

### III. BURDEN OF PROOF AND STANDARD OF REVIEW

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). "While parental rights are of constitutional magnitude, they are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional

5

and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). In a termination case, the petitioner seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (Vernon 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Holick* at 20–21; *In re M.C.T.*, 250 S.W.3d 161, 167 (Tex. App.—Fort Worth 2008, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subdivision (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. §§ 161.001, 161.206(a). Evidence is clear

and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (Vernon 2008). Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and modification).

In reviewing the evidence for legal sufficiency in parental termination cases, we must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We must review all the evidence in the light most favorable to the finding and judgment. *Id.* This means that we must assume that the factfinder resolved any disputed facts in favor of its finding if a reasonable factfinder could have done so. *Id.* We must also disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We must consider, however, undisputed evidence even if it is contrary to the finding. *Id.* That is, we must consider evidence favorable to termination if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *Id.*

We must therefore consider all of the evidence, not just that which favors the verdict. *Id.* But we cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573–74. And even when credibility issues appear in the appellate record, we must defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we must give due deference to the factfinder's findings and not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We must determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated the relevant conduct provisions of section 161.001(1) and that the termination of the parent-child relationship would be in the best interest of the child. *C.H.*, 89 S.W.3d at 28. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

## IV. EVIDENTIARY SUFFICIENCY OF ENDANGERMENT FINDINGS

In his first two issues, James argues that the evidence is legally and factually insufficient to support the trial court's family code section 161.001(1)(D) and (E) endangerment findings.

Endangerment means to expose to loss or injury, to jeopardize. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). The trial court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has knowingly placed or knowingly allowed the child to remain in conditions or surroundings that endanger the physical or emotional well-being of the child. Tex. Fam. Code Ann. § 161.001(1)(D). Under subsection (D), it is necessary to examine evidence related to the environment of the child to determine if the environment was the source of endangerment to the child's physical or emotional well-being. *In re D.T.*, 34 S.W.3d 625, 632 (Tex. App.—Fort Worth 2000, pet. denied). Conduct of a parent in the home can create an environment that endangers the physical and emotional well-being of a child. *J.T.G.*, 121 S.W.3d at 125.

The trial court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangers the physical or emotional well-being of the child. Tex. Fam. Code

Ann. § 161.001(1)(E). Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical or emotional well-being was the direct result of the parent's conduct, including acts, omissions, and failures to act. *J.T.G.*, 121 S.W.3d at 125. Termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *Id.*; *D.T.*, 34 S.W.3d at 634. Because the evidence pertaining to subsections 161.001(1)(D) and (E) is interrelated, we conduct a consolidated review. *In re T.N.S.*, 230 S.W.3d 434, 439 (Tex. App.—San Antonio 2007, no pet.); *J.T.G.*, 121 S.W.3d at 126.

To support a finding of endangerment, the parent's conduct does not necessarily have to be directed at the child, and the child is not required to suffer injury. *Boyd*, 727 S.W.2d at 533. The specific danger to the child's well-being may be inferred from parental misconduct alone; and to determine whether termination is necessary, courts may look to parental conduct both before and after the child's birth. *Id.*; *In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.).

Parental and caregiver illegal drug use support a finding that the child's surroundings endanger her physical or emotional well-being. *J.T.G.*, 121 S.W.3d at 125. Likewise, a parent's incarceration adds support to a trial

10

court's finding that the child's surroundings endangered her physical or emotional well-being. *Boyd*, 727 S.W.2d at 533–34. This is true even though imprisonment alone does not necessarily constitute "engaging in conduct which endangers the emotional or physical well-being of a child." *Id.*; *D.T.*, 34 S.W.3d at 635–36. But the State need not show incarceration was a result of a course of conduct endangering the child; it need only show incarceration was part of a course of conduct endangering the child. *Boyd*, 727 S.W.2d at 533–34. Thus, if the evidence, including imprisonment, proves a course of conduct that has the effect of endangering the child, the requirement of showing that the endangerment of the child's physical or emotional well-being was the direct result of the parent's conduct is met. *Id*. Furthermore, evidence of exposing a child to domestic violence supports an endangerment finding. *See In re M.R.*, 243 S.W.3d 807, 819 (Tex. App.—Fort Worth 2007, no pet.) (holding that there was legally and factually sufficient evidence of both endangerment grounds when, among other things, the evidence showed that the mother exposed her children to domestic violence).

In this case, the evidence shows that James used illegal drugs before and after Martha was born. James himself testified that he used drugs before and after Martha's birth. Martha's mother also testified to James's drug use, her own drug use, and that both of them exposed Martha and Martha's older half-

11

brother to drugs. She also testified that James knowingly left Martha in her care, even though he knew she was using drugs. Martha's mother said that James would be affected by his methamphetamine use for days, and that this contributed to his temper and domestic violence issues. James is also an admitted recidivist—having been incarcerated multiple times for theft-related crimes. James is currently incarcerated. And there is evidence that he knowingly left Martha in an environment, living with her mother, where the caregiver was using and selling drugs.

Giving due deference to the trial court's findings, we hold that a reasonable trier of fact could have formed a firm belief or conviction that James knowingly placed Martha in conditions and engaged in conduct that endangered her physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E); *J.P.B.*, 180 S.W.3d at 573; *C.H.*, 89 S.W.3d at 28. Accordingly, we hold that the evidence is legally and factually sufficient to support the trial court's environmental endangerment and course of conduct endangerment findings. We overrule James's first and second issues.

V. EVIDENTIARY SUFFICIENCY OF BEST INTEREST FINDING

In his third issue, James argues that the evidence is factually insufficient to support the trial court's best interest finding. We disagree.

12

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (Vernon 2008). The following factors should be considered in evaluating the parent's willingness and ability to provide the child with a safe environment:

(1) the child's age and physical and mental vulnerabilities;

(2) the frequency and nature of out-of-home placements;

(3) the magnitude, frequency, and circumstances of the harm to the child;

(4) whether the child has been the victim of repeated harm after the initial report and intervention by the department or other agency;

(5) whether the child is fearful of living in or returning to the child's home;

(6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home;

(7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home;

(8) whether there is a history of substance abuse by the child's family or others who have access to the child's home;

(9) whether the perpetrator of the harm to the child is identified;

13

(10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

(11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time;

(12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with:

(A) minimally adequate health and nutritional care;

(B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development;

(C) guidance and supervision consistent with the child's safety;

(D) a safe physical home environment;

(E) protection from repeated exposure to violence even though the violence may not be directed at the child; and

(F) an understanding of the child's needs and capabilities; and

(13) whether an adequate social support system consisting of an extended family and friends is available to the child.

*Id.* § 263.307(b); *see R.R.*, 209 S.W.3d at 116.

Other, nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include (a) the desires of the child, (b) the emotional and physical needs of the child now and in the

future, (c) the emotional and physical danger to the child now and in the future, (d) the parental abilities of the individuals seeking custody, (e) the programs available to assist these individuals to promote the best interest of the child, (f) the plans for the child by these or by the agency seeking custody, (g) the stability of the home or proposed placement, (h) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one, and (i) any excuse for the acts or omissions of the parent.  *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate.  *C.H.*, 89 S.W.3d at 27.  Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child.  *Id.*  On the other hand, the presence of scant evidence relevant to each factor will not support such a finding.  *Id.*

We have already detailed above the evidence of James's longstanding course of illegal drug use, the mother's drug use, and the evidence that James knowingly exposed Martha and her half-brother to the couple's drug use. James also showed callus disregard for children in general when confronted with his and the mother's use of methamphetamine and marijuana in front of

15

Martha's half-brother by stating, "This was not my child." Regarding Martha's living situation, Martha has lived with her maternal grandfather and her half-brother since she came into foster care. Before that, James had left Martha to live with her mother, whom James knew at the time was a frequent drug user, and there is evidence in the record that she sold drugs.

Regarding James's completion of the service plan that CPS formulated for him, James testified that he had taken parenting classes, but the CPS caseworker testified that she had not received any certifications of completion or information that the parenting classes he took even complied with the service plan's requirements. When asked specifically about the service plan, the CPS caseworker stated, "I don't see any services that I can say that he has completed." Although James testified that he sought help for his drug use from prison counseling and is currently not addicted to drugs, he admitted that he previously discontinued using drugs during his earlier incarceration and began using again after he was released. The CPS caseworker testified that she believed termination was in Martha's best interest and that the maternal grandfather should be allowed to adopt her because the grandfather could "provide the stability and the permanent home that [Martha and her half-brother] need." The caseworker also expressed concerns over James's ability to remain "clean" from his drug use.

16

As stated above, at the time of trial, Martha was living with her maternal grandfather and half-brother. The grandfather intends to adopt both children and keep them together. There is evidence that Martha is bonded to the grandfather and half-brother.

James admitted that he would not be able to fully provide for Martha until "six to nine months" after his release from incarceration. He also admitted that this time period could possibly be extended to the point that Martha would be nearing seven years old. At that time, Martha would have lived with her maternal grandfather for at least five years continuously.

Considering the relevant statutory factors in evaluating James's willingness and ability to provide Martha with a safe environment and the *Holley* factors—including her emotional and physical needs now and in the future, the potential emotional and physical danger to her in the future if James again begins to use drugs once released from incarceration, the parental abilities of the grandfather who is seeking custody, and the acts or omissions of James that indicate that the existing parent-child relationship is not a proper one, all of which weigh in favor of termination—we conclude that in light of the entire record and giving due consideration to evidence that the factfinder could have reasonably found to be clear and convincing, a factfinder could reasonably have formed a firm belief or conviction that termination of James's parental rights to

17

Martha is in her best interest.  We hold that the evidence is factually sufficient to support the trial court's section 161.001(2) best interest finding.  *See* Tex. Fam. Code Ann. § 161.001(2).  Accordingly, we overrule James's third issue.

## VI.  CONCLUSION

Having overruled James's three issues, we affirm the trial court's order terminating the parent-child relationship between James and Martha.

PER CURIAM

PANEL:  MEIER, GARDNER, and WALKER, JJ.

DELIVERED:  December 31, 2009

18